**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **GAIL L. PORTER,** | : | |
| Plaintiff | : | |
| | : | |
| VS. | : | **3:CV-04-2675** |
| | : | **(JUDGE VANASKIE)** |
| **JO ANNE B. BARNHART** | : | |
| **Commissioner of Social Security,** | : | |
| Defendant | : | |

## MEMORANDUM

Plaintiff Gail Porter commenced this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the decision of the Commissioner of Social Security ("Commissioner") to deny her claim for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 423. The case was referred to Magistrate Judge Blewitt, who recommended that Ms. Porter's appeal be denied. (Report and Recommendation (Dkt. Entry 11).)

Ms. Porter has made four objections to Magistrate Judge Blewitt's Report and Recommendation ("R & R"). First, Plaintiff contends that Magistrate Judge Blewitt improperly discounted the opinion of Ms. Porter's psychologist. Second, she asserts that the R & R failed to consider the opinions of Ms. Porter's treating physicians regarding her depression. Third, she argues that the R & R gave too much weight to a non-treating physician's opinion. Lastly, Plaintiff contends that the R & R disregarded evidence related to her Multiple Chemical

Sensitivities[1] ("MCS").  (Pl.'s Objections to the R & R (Dkt. Entry 12).)

Having carefully considered the record de novo and given plenary consideration to Plaintiff's contentions, I find that the Commissioner's decision is supported by substantial evidence.  Accordingly, the R & R will be adopted and the Commissioner's decision denying Plaintiff's application for DIB will be affirmed.

## I.  BACKGROUND

In 1990, Ms. Porter suffered adverse reactions to fumes from floor wax and floor wax stripper while working as a nursing assistant.  (R. at 462.)  She claims that she became disabled as of December 31, 1992, due to MCS, depression, bronchitis, Wilson's syndrome, fibromyalgia, chronic obstructive pulmonary impairment, and asthma.[2]  (Id. at 17.)

---

[1]  MCS is a "chronic, recurring disease caused by a person's inability to tolerate an environmental chemical or class of foreign chemicals."  Wikipedia, at http://en.wikipedia.org/wiki/Multiple_chemical_sensitivity (last visited January 10, 2007).  MCS is also known as Idiopathic Environmental Intolerance.  Id.

[2]  Wilson's disease is an "autosomal recessive hereditary disease . . . .  Its main feature is accumulation of copper in tissues, which manifests itself with neurological symptoms and liver disease."  Wikipedia, at http://en.wikipedia.org/wiki/Wilson's_disease (last visited January 10, 2007).
   Fibromyalgia is a "chronic syndrome . . . characterized by diffuse or specific muscle, joint, or bone pain, fatigue, and a wide range of other symptoms. . . .  The nature of fibromyalgia is not well understood."  Wikipedia, at http://en.wikipedia.org/wiki/Fibromyalgia (last visited January 10, 2007)
   Chronic obstructive pulmonary disease is an "umbrella term for a group of respiratory tract diseases that are characterized by airflow obstruction or limitation."  Wikipedia, at http://en.wikipedia.org/wiki/Chronic_obstructive_pulmonary_disease (last visited January 10, 2007).

Under the Social Security Act, Ms. Porter was last insured for DIB on September 30, 1996 (the "DLI"). (Id. at 24.) She applied for DIB and Supplemental Security Income ("SSI") payments on December 23, 1996. A hearing on Ms. Porter's claims was held before an Administrative Law Judge ("ALJ") on May 15, 2003.[3] The ALJ granted Ms. Porter's application for SSI, but denied her application for DIB because she was not disabled while insured for DIB. (Id. at 23-25.) That is, the ALJ concluded that her disability onset date fell after her insured status expired. Specifically, the ALJ determined that, although Plaintiff met the requirements for the listed impairment for somatoform disorder found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.07, she did not do so until May of 1997, about nine months after her DLI. (R. at 24-25.) Consequently, Ms. Porter was denied DIB but awarded SSI benefits. (Id. at 25-26.) The ALJ's decision became the final decision of the Commissioner of Social Security when the Appeals Council denied Ms. Porter's request for review on October 8, 2004. (Id. at 5-7.)

On December 10, 2004, Ms. Porter filed a complaint requesting this Court to reverse the decision of the Commissioner and grant her DIB. (Compl. (Dkt. Entry 1).) Magistrate Judge Blewitt, finding that the Commissioner's decision was supported by substantial evidence, recommended that Ms. Porter's appeal be denied. (R & R (Dkt. Entry 11) at 19.) As stated earlier, Ms. Porter has filed four objections to Magistrate Judge Blewitt's R & R. The parties

---

[3] A previous ALJ found that Ms. Porter was not entitled to DIB or SSI payments. (R. at 89-101.) The Appeals Council vacated the ALJ's decision and remanded the matter for further consideration. (See id. at 16.)

3

have briefed the objections, and the matter is ripe for resolution.

## II.  STANDARD OF REVIEW

Judicial review of the Commissioner's decision to deny DIB is limited to ascertaining whether the decision is supported by "substantial evidence."  42 U.S.C. § 405(g); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).  Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Mason, 944 F.2d at 1064 (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).  So long as the Commissioner's findings of fact are supported by substantial evidence, the Court is not free to decide the facts of the case for itself – even if it might decide those facts differently from the Commissioner.  See Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001).

Ms. Porter has objected to Magistrate Judge Blewitt's review of the Commissioner's decision.  Where objections to a magistrate judge's R & R are filed, the Court must conduct a de novo review of the contested portions of the record.  28 U.S.C. § 636(b)(1).  The Court may also accept, reject, or modify any other finding or recommendation made by the magistrate judge.  Id.

## III.  DISCUSSION

Ms. Porter has filed four objections to Magistrate Judge Blewitt's R & R.  Ms. Porter's first two objections essentially assert that her depression met or medically equaled the criteria for a mental disorder under 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.04.  In her third

objection, Ms. Porter claims that the R & R and the ALJ gave too much weight to the opinion of a non-treating physician.  In her final objection, Ms. Porter asserts that she was unable to work because of her MCS.

**A.  Whether Ms. Porter was Disabled from Depression while Insured for DIB**

Ms. Porter contends that the "medical evidence establishes a disabling depression at least one year prior to the date last insured and this is sufficient to establish disability." (Pl.'s Br. Supp. Objections to R & R (Dkt. Entry 13) at 3.)  She claims that her depression met or medically equaled the requirements of an affective disorder under 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.04.  (See id. at 5-6.)  She asserts that the ALJ ignored the opinions of her treating physicians in finding that she was not under an affective disorder while insured for DIB. (Id.)  Because Ms. Porter has objected to the R & R, the Court will undertake a fresh review of the record.[4]

Under 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.04, Ms. Porter may establish that she was suffering from a severe affective disorder by showing:

> A. Medically documented persistence, either continuous or

---

[4]  Ms. Porter also objected to the inference in the R & R that Dr. Elizabeth Revell's diagnosis of depression was undermined by her failure to prescribe Ms. Porter antidepressants. (R & R (Dkt. Entry 11) at 15.)  Dr. Revell is not a licensed medical doctor (she is a licensed psychologist).  Ms. Porter protests that Dr. Revell could not prescribe medication because she was not a medical doctor.  (Pl.'s Br. Supp. Objections to the Magis. Judge's R & R (Dkt. Entry 13) at 2-3.)  The Court will not consider Dr. Revell's inability to prescribe medication in its fresh review of the record.  The objection, therefore, is no longer material.

>>intermittent, of . . . [d]epressive syndrome . . .
>
>>B. Resulting in at least two of the following:
>
>>>1. Marked restriction of activities of daily living; or
>>>2. Marked difficulties in maintaining social functioning; or
>>>3. Marked difficulties in maintaining concentration, persistence, or pace; or
>>>4. Repeated episodes of decompensation, each of extended duration;

id., or by showing:

>>C. Medically documented history of a chronic affective disorder of at least 2 years' duration . . . and one of the following:
>
>>>1. Repeated episodes of decompensation, each of extended duration; or
>>>2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
>>>3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

Id.

The ALJ found that Ms. Porter did not establish the requirements of Parts A, B, or C. (R. at 20-21.) In performing the evaluation, the ALJ considered the testimony of the independent medical expert, Dr. Robert Brown, Jr., the opinions and evidence offered by numerous medical experts who treated Ms. Porter, and Ms. Porter's own testimony. (Id. at 18-

6

20.)

Under Part A, the ALJ determined that Ms. Porter failed to establish a medically documented persistence of depressive syndrome because:

> The medical expert testified that she had some depressed mood, which was reactive, but did not have depression. There is no psychiatric or psychological evaluation [while she was insured for DIB] that clinically establishes a mental impairment. By self-report, the claimant's depression from December 1992 to March 1997 was described as mild.

(Id. at 20.)

Under Part B, the ALJ found that Ms. Porter failed to show the requisite severity of her depression. First, her depression did not restrict her activities, as she was able to bike, hike, grocery shop, do laundry, clean, cook, and do yard work. (Id.) She also maintained social functioning, as she maintained relationships with her family, visited her parents, and did not have difficulties getting along with others. (Id.) Though the ALJ did find that Ms. Porter had mild difficulties maintaining concentration, persistence, or pace, she was able to read for five to twelve hours a day, do needlework, and sew. (Id.) Lastly, there was no evidence of repeated episodes of decompensation. (Id.)

Under Part C, the ALJ did not find that Ms. Porter established a severe, chronic affective disorder because she did not have repeated episodes of decompensation or marginal adjustment, and she did not require a highly supportive living arrangement. (Id. at 21.) Because Ms. Porter did not meet the requirements under Parts A and B, or under Part C, the

ALJ found that Ms. Porter's depression did not meet or medically equal the listings for a severe affective disorder.

Ms. Porter argues that the ALJ's decision is at odds with the opinions and medical evidence presented by her treating medical experts. (Pl.'s Br. Supp. Objections to the R & R (Dkt. Entry 13) at 3.) In contrast with the ALJ's findings regarding Part A, Ms. Porter asserts that the medical records establish a mental impairment at least a year prior to the DLI. (Id.) Specifically, Ms. Porter points to the medical evaluations submitted by Dr. Barbara Hoffman, Dr. Allen Greenstein, Dr. Stephen Schwartz, and Dr. Elizabeth Revell indicating that Ms. Porter had symptoms and complaints of depression before the DLI. (Id. at 3-6.)

This evidence was considered by the ALJ. (R. 18-20.) The ALJ, however, found that the evaluations failed to document depressive syndrome before the DLI, because they were all conducted after the DLI. (Id.) The burden is on the claimant "to present medical findings that show his or her impairment matches a listing or is equal in severity to a listed impairment." Burnett v. Commissioner of Social Sec. Admin., 220 F.3d 112, 120 n.2 (3d Cir. 2000); see also 20 C.F.R. § 404.1512(a). Under 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.04(A), a claimant establishes depressive syndrome by showing at least four of nine significant characteristics of depressive syndrome. Ms. Porter asserts that she met this requirement because she had feelings of worthlessness, thoughts of suicide, sleep disturbance, and decreased energy before the DLI. (Pl.'s Br. Supp. Objections to the R & R (Dkt. Entry 13) at 6.)

There are no medical findings dated <u>before</u> the DLI that confirm Ms. Porter's assertions.[5]

In a letter dated well after the DLI, Ms. Porter's psychologist, Dr. Revell, stated that she treated Ms. Porter for significant depression and suicidal ideation in 1995.  The treatment, though, ended four months later "with the situation having stabilized somewhat."  (R at 63-64, 489.)  Beyond telephone communication with Dr. Revell in March 1996, Ms. Porter did not seek treatment for depression from any other doctors while insured for DIB.  (<u>Id.</u> at 63-64.)

Ms. Porter argues that Dr. Greenstein's diagnosis of dysthymia on October 28, 1997, medically establishes that she was severely depressed before the DLI (September 30, 1996). Dysthymia is a "chronically depressed mood that occurs for most of the day more days than not <u>for at least two years</u>."  (Pl.'s Br. Supp. Objections to the R & R (Dkt. Entry 13) at 5 (citing <u>Diagnostic and Statistical Manual of Mental Disorders</u> (4th ed. 2000).)  According to Ms. Porter, Dr. Greenstein's diagnosis means that she "must have had suffered from her condition since October 1995 [(two years before the diagnosis)] . . . by the very definition" of the diagnosis.  (<u>Id.</u> at 5.)  Dr. Greenstein did not treat Ms. Porter before the DLI.  (R. at 446.)  His diagnosis of dysthymia was based largely on Ms. Porter's own statement of her condition before the DLI. (<u>Id.</u> at 448).)  He did not make a specific diagnosis of Ms. Porter's condition before the DLI.

Because Ms. Porter did not present definitive medical documentation of severe depression before the DLI, the ALJ was persuaded by the independent medical expert's opinion

---

[5] Some of the medical evaluations in the record note Ms. Porter's symptoms before the DLI.  These are not medical findings, but simply notes of Ms. Porter's stated history.

and Ms. Porter's own self-assessment that Ms. Porter's depression was not severe. (R. at 20.) After reviewing the records in this case, the medical expert opined that Ms. Porter had some depressed mood before the DLI, but not major depressive disorder until 1997.[6] (Id. at 31, 39-40.) He found Ms. Porter's depression to be secondary to her MCS. (Id. at 39.) He did not believe that Ms. Porter's depression met the criteria of a listed impairment. (Id. at 39.)

In an attachment submitted with a statement to the Social Security Administration, Ms. Porter described her depression before the DLI as "mild depression with moderate mood swings." (Id. at 216-18.) Ms. Porter also denied depression when examined by Dr. Schwartz in May 1997. (Id. at 438.) Such statements fail to establish that Ms. Porter was disabled by depression before the DLI. There is substantial evidence in the record, therefore, to support the ALJ's determination that Ms. Porter failed to establish a medically documented persistence of depressive syndrome under Part A of § 12.04 before the DLI.

Moreover, Ms. Porter fails to cast doubt on the ALJ's determination that she failed to show two of the requisite restrictions or difficulties listed under Part B of § 12.04. Ms. Porter first attacks the ALJ's conclusion that her depression did not result in a marked restriction of her daily activities because she was able to bike, hike, grocery shop, do laundry, clean, cook, and

---

[6] It should be noted that the medical expert had difficulty forming an opinion on Ms. Porter's medical status before the DLI because of a lack of medical records from this time period. (Id. at 32.) This is in accord with the ALJ's assessment that Ms. Porter failed to present sufficient documentation to establish an affective disorder before the DLI, as required under Part A of 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.04. (Id. at 20.)

do yard work. (Id. at 20.)  Ms. Porter argues that she needed assistance to perform some of these activities, such as grocery shopping, cleaning, and doing laundry. (Id. at 215; but see id. at 447 (suggesting Ms. Porter could do laundry without assistance).)

A person may have a marked limitation if "the degree of limitation is such as to interfere seriously with [the person's] ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00(C). Though Ms. Porter did have some limitations before the DLI, she nonetheless appeared to function independently and effectively.[7]  Significantly, she was able to cook for her family daily and participate in many other productive functions like gardening and sewing. (R. at 215, 432, 447.)

Ms. Porter also asserts that her depression resulted in marked difficulties in maintaining concentration, persistence, or pace. (Pl.'s Br. in Supp. of Objections to the R & R (Dkt. Entry 13) at 4.)  Ms. Porter supports her position with activity assessments from 2003, six years after the DLI. (Id. at 4; see also R. at 477-78, 498-99.)  Evidence closer in time to the DLI, though, indicates Ms. Porter was capable of maintaining concentration. In an evaluation from 1997, Dr. Greenstein found that Ms. Porter "is a bright and articulate woman whose cognitive resources certainly appear to be intact. She is capable of performing arithmetic problems easily. She was able to recall seven digits forward and six reversed in proper sequence. She certainly is

---

[7] Unfortunately, it is unclear from the record what level of "assistance" Ms. Porter needed to shop, clean, or do laundry. The burden was on Ms. Porter to present this evidence. 20 C.F.R. § 404.1512(a).

11

capable of managing any funds to which she is entitled." This is sufficient evidence for the ALJ to determine that she did not have a marked difficulty maintaining concentration, persistence, or pace. See 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00(C)(3).

Ms. Porter also maintained social functioning with her family through her DLI. In 1997, she continued to live with her husband and daughter. (R. at 447.) She visited her parents at a retirement center once every two weeks. (Id. at 448.) She was also able to interact with grocery clerks and her daughter's friends. (C.f. id. at 432, 447.) Any limitations she did have in social functioning appeared to be the result of her MCS, not depression. (Id. at 447 (noting that her family and friends had to observe her chemical restrictions).)

Ms. Porter does not assert that she had repeated episodes of decompensation under criteria 4 of Part B.  Because Ms. Porter fails to establish that her depression resulted in two of the requisite restrictions or difficulties listed under Part B of § 12.04, she has not shown the requisite severity for an affective disorder disability.

Ms. Porter does not argue that she meets the requirements of Part C of § 12.04. Specifically, she does not claim that suffered repeated episodes of decompensation, had a residual disease process, or required a highly supportive living arrangement. See 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.04(C).

There is sufficient evidence in the record to support the ALJ's decision that Ms. Porter's depression did not match the criteria under 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.04

prior to September 30, 2006.  Her objection, therefore, is without merit.[8]

### B.  The Weight Accorded to Dr. Brown's Opinion

Ms. Porter objects to the weight the ALJ accorded to the medical expert's opinion.  It is proper for an ALJ to consider the opinion of a medical expert on the nature and severity of a claimant's impairments and on whether the claimant's impairments equals the requirements of any listed impairment listed under 20 C.F.R. Part 404, Subpart P, Appendix 1.  See 20 C.F.R. § 404.1527(f)(2)(iii).  Ms. Porter argues that the ALJ gave the medical expert's opinion too much weight compared to the evaluations of her treating physicians.

In this case, the medical expert, Dr. Brown, reviewed the medical records twice.  (R. at

---

[8] The finding that Plaintiff met the requirements for the listed impairment for somatoform disorder as of May, 1997, is not inconsistent with the conclusion that she did not meet the requirements for the listed impairment of affective disorder before September 30, 1996.  As explained in Smith v. Chater, 81 F.3d 165, 165 n.2 (8th Cir. 1996):

> Somatoform disorder is a condition in which there are "physical symptoms for which no physical cause can be found, and for which there is definite or strong evidence that the underlying cause is psychological." One such somatoform disorder is hypochondriasis.

The record disclosed this form of somatoform disorder, as identified by Dr. Brown, with marked restrictions on daily living and marked difficulties in social functioning becoming apparent in May of 1997.  (R. at 43-44, 435.)  There is substantial evidence that prior to that time, however, the impact on daily living and social functioning was not significant.  For example, Dr. Hoffman's report of March 18, 1997, stated that Plaintiff was then capable of biking or hiking for up to one hour at 15 to 30 minute intervals with rest, grocery shopping for up to one hour, with assistance, doing laundry for 3 to 5 hours with assistance, cleaning for 1 hour with assistance, working in the garden for up to 2 hours, and reading for 5 to 12 hours.  (R. 432.)  This description is not consistent with the essentially home-bound claimant assessed by Dr. Schwartz in May of 1997.  (R. 434-38.)  Accordingly, there was a substantial basis for finding that Ms. Porter was not disabled until May of 1997.

31.) While testifying before the ALJ, Dr. Brown discussed the evaluations of Ms. Porter's treating physicians. (Id. at 37-48.) All the evaluations, however, were dated after the DLI. Dr. Brown found that the evaluations established impairments <u>after</u> the DLI, but not before the DLI. (See id. at 41-43.) Symptoms noted in the evaluations from before the DLI came from Ms. Porter's own statements, not medical testing. (Id. at 38-39)

Ms. Porter argues that Dr. Brown's opinion is inconsistent with diagnoses made by her treating physicians after the DLI. (Pl.'s Br. Supp. of Objections to the R & R (Dkt. Entry 13) at 9-10.) Dr. Brown's opinion, however, does not contradict the evaluations by Ms. Porter's treating doctors. Dr. Brown stated that Ms. Porter's MCS, fibromyalgia, and thyroid problems were not medically tested before the DLI. (R. at 39-43.) This is in accord with the record. For example, though Dr. Schwartz diagnosed Ms. Porter with MCS and "[p]ossible fibromyalgia" in May of 1997 (after the DLI), he observed, "[i]n terms of tests that [w]e have on records, we have an old EKG from 1994 which is basically normal. We do not have any other tests or laboratory tests at this time including pulmonary function studies that she has had done in the past." (Id. at 438.)

Dr. Brown did find that bronchitis and "some depressed mood" were established before the DLI. (Id. at 39.) It was his opinion, though, that these impairments did not meet or medically equal a listed impairment. (Id. at 47.) Ms. Porter objects that the ALJ relied too much on Dr. Brown's opinion to find that she was not suffering from a disabling depression

14

before the DLI. (Pl.'s Br. Supp. Objections to R & R (Dkt. Entry 13) at 9-10.) As discussed above, the ALJ's decision to deny Ms. Porter's claim for DIB based on an affective disorder is supported by "substantial evidence."

### C.  Whether Ms. Porter Was Unable to Work While Insured for DIB

Ms. Porter's final objection is that the ALJ erred in finding that Ms. Porter "retained the capacity to adjust to work that exists in significant numbers in the national economy and was not under a disability" before the DLI.[9] (R at 24.) In particular, Ms. Porter argues that the ALJ disregarded the opinions of his treating physicians indicating that she could not work. (Pl.'s Br. Supp. of Objections to the R & R (Dkt. Entry 13) at 14.)

An ALJ must make an assessment of a claimant's residual functional capacity to do work. 20 C.F.R. §§ 404.1520, 416.920. "Residual functional capacity" is the most a claimant can do despite her limitations. 20 C.F.R. §§ 404.1545, 416.945. The ALJ found Ms. Porter's residual functional capacity before the DLI to be as follows:

> [Ms. Porter] could perform the broad world of work, alternating positions every 2 hours for 15 minutes during normal breaks. She could never have exposure to extreme cold or exposure to fumes, dusts, gases or poor ventilation. She could never work with toxic chemicals. Because of occasional difficulties with depressed

---

[9] Ms. Porter's objection focuses on the ALJ's consideration of her MCS. It should be noted, though, that all of the claimant's impairments are considered in determining whether a claimant can make an adjustment to other work. 20 C.F.R. §§ 404.1545, 416.945. Thus, the ALJ correctly considered Ms. Porter's other impairments in her analysis, such as Ms. Porter's depressed state. (R. at 22.)

15

> mood, fatigue, motivation, social withdrawal and perceived
> chemical sensitivities, she was limited to understanding,
> remembering and carrying out simple instructions, making simple
> work-related decisions, responding appropriately to supervision,
> co-workers and usual work situations and handling changes in a
> routine work setting appropriately on a sustained and continuing
> basis. She could work with the public only occasionally.

(R at 21.)

In determining Ms. Porter's residual functional capacity, the ALJ considered both medical opinions and Ms. Porter's own testimony. (Id. at 21-22.) The ALJ found that Ms. Porter was "generally credible" but exaggerated her limitations based on objective medical evidence. (Id.) Significantly, the residual functional capacity addressed both Ms. Porter's MCS and her depression. (Id. at 22.)

Ms. Porter objects that the ALJ's assessment is at odds with the opinions of Dr. Hoffman and Dr. Schwartz. In an evaluation dated after the DLI, Dr. Hoffman opined that "this nice lady is unfortunately unable to sustain employment and that her condition is unlikely to improve." (Id. at 433.) Dr. Hoffman does not include a thorough assessment of Ms. Porter's functional capacity in reaching her conclusion. Earlier in the evaluation, though, Dr. Hoffman noted that Ms. Porter was capable of performing some exertional activities, such as biking and hiking. (Id. at 432.) Dr. Hoffman also noted that Ms. Porter could perform light activities like gardening and reading. (Id.) The ALJ cited the same evidence in her residual functional capacity assessment.

(Id. at 22.)  The ALJ considered Dr. Hoffman's assessment, but did not find that the objective medical evidence supported Dr. Hoffman's conclusion.  (Id.)

Dr. Schwartz completed a medical source statement of Ms. Porter's ability to perform work-related physical activities in May 1997.  (Id. at 444-45.)  Dr. Schwartz determined that Ms. Porter was capable of performing many physical tasks, such as pushing and pulling with her hands and feet.  (Id.)  He did find that Ms. Porter was more restricted in certain activities than the ALJ.  For instance, Dr. Schwartz noted that Ms. Porter must alternate positions every sixty minutes, while the ALJ found that Ms. Porter must alternate positions every two hours and fifteen minutes.  (Compare id. at 444, with id. at 21.)  Dr. Schwartz also found that Ms. Porter must avoid exposure to: poor ventiliation, heights, temperature extremes, chemicals, wetness, dust, noise, fumes, odors, gases, and humidity.  (Id. at 445.)  These restrictions were also noted by the ALJ in her residual functional capacity assessment.  (Id. at 21.)  There does not appear to be too much of a conflict, therefore, between Dr. Schwartz's assessment and the ALJ's.  Any minor conflict can be explained by the ALJ relying on evidence in the record, such as Ms. Porter's statement of her weekly activities before the DLI.  (See id. at 215.)

Based on the ALJ's functional capacity assessment, a vocational expert opined that Ms. Porter could have adjusted to work as a packager, sorter, or final assembler.  The ALJ, therefore, determined that Ms. Porter was not disabled before the DLI, because she retained the capacity to adjust to work that exists in significant numbers in the national economy.

17

Contrary to Ms. Porter's objection, the ALJ did consider Ms. Porter's limitations resulting from MCS.[10]  Because the ALJ's decision is supported by substantial evidence, Ms. Porter's objection will be denied.

## IV. CONCLUSION

For the reasons set forth above, the Report and Recommendation of Magistrate Judge Blewitt will be adopted and the Commissioner's decision denying Plaintiff's application for disability insurance benefits will be affirmed.  An appropriate Order follows.

**s/ Thomas I. Vanaskie**
Thomas I. Vanaskie
United States District Judge

---

[10] Ms. Porter cites Kouril v. Bowen, 912 F.2d 971 (8th Cir. 1990), and Vogt v. Chater, 958 F. Supp. 537 (D. Kan. 1997), to support her argument that the ALJ did not adequately consider her limitations from MCS.  In both cases, the Court found that the ALJ erred in finding the claimant could not return to the claimant's past relevant work.  Kouril, 912 F.2d at 976 (the ALJ failed to consider relevant evidence); Vogt, 958 F. Supp. at 545-47 (the ALJ mistakenly relied on insignificant and unreliable evidence).  These cases do not undermine the ALJ's decision in this matter, as the ALJ properly considered all relevant and reliable evidence in assessing Ms. Porter's ability to work before the DLI.  (R. at 22-24.)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **GAIL L. PORTER,** : | |
| Plaintiff : | |
| : | |
| VS. : | **3:CV-04-2675** |
| : | **(JUDGE VANASKIE)** |
| **JO ANNE B. BARNHART** : | |
| **Commissioner of Social Security,** : | |
| Defendant : | |

## ORDER

**NOW, THIS 11th DAY OF JANUARY, 2007**, for the reasons set forth in the foregoing Memorandum, **IT IS HEREBY ORDERED THAT**:

1. The Report and Recommendation of Magistrate Judge Blewitt (Dkt. Entry 11) is **ADOPTED**.

2. The decision of the Commissioner of Social Security is **AFFIRMED.**

3. The Clerk of Court is directed to enter judgment in favor of the Commissioner of Social Security and against Plaintiff.

4. The Clerk of Court is further directed to mark this matter **CLOSED.**

                                               **s/ Thomas I. Vanaskie**
                                               Thomas I. Vanaskie
                                               United States District Judge